UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| UNIVERSITY OF VIRGINIA ) | |
| PATENT FOUNDATION, ) | Civil Action No. 3:14cv51 |
|     Plaintiff, ) | |
| v. ) | MEMORANDUM OPINION |
| ) | |
| GENERAL ELECTRIC COMPANY ) | By:    Joel C. Hoppe |
| d/b/a GE HEALTHCARE, ) | United States Magistrate Judge |
|     Defendant. ) | |

Before the Court is Defendant General Electric Company's ("GE") motion to prevent disclosure of its confidential information to Plaintiff University of Virginia Patent Foundation's ("UVAPF") proposed expert. ECF No. 77. The matter has been thoroughly briefed by both parties, *see* ECF Nos. 77-1 (GE's brief in support), 90 (UVAPF's response in opposition), 93 (GE's reply brief), 99 (UVAPF's surreply), and the Court heard oral argument on September 21, 2015. Having considered the relevant case law and the parties' briefs, exhibits, and oral arguments, the Court GRANTS IN PART and DENIES IN PART GE's motion.

I. Factual and Procedural History

This case concerns two patents related to magnetic resonance ("MR") imaging. UVAPF alleges that GE, a manufacturer of MR technologies, infringed upon Patent No. RE44,644 (the '644 patent), titled "Method and apparatus for spin-echo-train MR imaging using prescribed signal evolutions." UVAPF later filed an amended complaint which added RE45,725 (the '725 patent), a continuation of the '644 patent. ECF No. 77. The parties are in discovery and have begun exchanging confidential materials under a protective order entered on June 18, 2015. ECF No. 63. Among these materials is GE's "highly confidential technical information," including "source code related to the operation of GE's MR systems." GE's Br. in Supp. 1. GE designated this material "CONFIDENTIAL OUTSIDE COUNSEL EYES ONLY" ("Confidential

1

Materials") affording it the highest level of protection under the protective order.[1] Paragraph 10 of the protective order requires a party intending to disclose Confidential Materials to an expert to notify opposing counsel and allow them five days to object.

On July 6, 2015, UVAPF notified GE that it intended to use Dr. Klaus Jürgen Hennig as a consultant and expert in the case and provided information on Dr. Hennig as required under the protective order. GE's Br. in Supp. Ex. A. GE objected and requested additional information. *Id.* at 3. The parties exchanged emails from July 11 to July 21 and met and conferred on July 21, but they were unable to resolve the dispute.

Dr. Hennig is a professor and the co-chairman and scientific director of the Department of Radiology, Medical Physics at the University Medical Center in Freiburg, Germany. Hennig Decl. ¶ 1, ECF No. 90; GE's Br. in Supp. Ex. A, at 6 (Dr. Hennig's curriculum vitae). Dr. Hennig is "a respected and accomplished MR scientist," GE's Br. in Supp. 1, with many publications, inventions, and consulting projects to his credit. *Id.*; *id*. Ex. A at 6–7.

GE has two primary objections to the disclosure of its Confidential Materials to Dr. Hennig. First, GE is concerned about Dr. Hennig's relationship with GE's rivals, especially Siemens Healthcare, which it describes as "by far GE's largest competitor," GE Br. in Supp. 3. *Id.* at 3–6, 9–11. The University Medical Center Freiburg collaborates with multiple companies involved in MR technology through the Center's MR Development and Application Center ("MRDAC"), including collaborations with Siemens since approximately 1993. Hennig Decl. ¶ 5; GE Br. in Supp. 3–4. In addition, Dr. Hennig has personally consulted with Siemens in the

---

[1] The protective order reserves the designation CONFIDENTIAL OUTSIDE COUNSEL EYES ONLY for "information of a commercially sensitive nature such as a trade secret that a producing party or producing third party determines in good faith is likely to cause significant competitive harm to its existing or prospective commercial relationships if disclosed to third parties or select employees or agents of the receiving party." Protective Order ¶ 1.b.

2

past with projects typically involving "reports about highlights from scientific meetings, assessment of new technologies and their market perspective, as well as strategic advice . . . relating to the market in developing countries." Hennig Decl. ¶ 7. Dr. Hennig has also given numerous presentations at meetings and conferences organized by Siemens. *Id.* ¶ 8; GE Br. in Supp. 5–6. GE is concerned that Dr. Hennig will inadvertently disclose its Confidential Materials to its biggest market competitor. GE Br. in Supp. 9–11.

Secondly, GE objects to Dr. Hennig as an independent inventor. GE indentifies two pending patent applications of Dr. Hennig's that it contends are related to its Confidential Materials. GE Br. in Supp. 6–8, 11–12. GE argues that Dr. Hennig's involvement in these applications would violate the prosecution bar. *Id.* GE also argues that UVAPF has too narrowly read the bar's prohibitions and fears that Dr. Hennig consequently does not appreciate the full scope of the bar. *Id.*

UVAPF contends that disclosure of GE's materials to Dr. Hennig does not present a significant risk of competitive injury because his direct consultation with Siemens has ended and both his past work and current collaborations through the MRDAC do not relate to the technology at issue in this suit. UVAPF Br. in Opp. 14–16. UVAPF further argues that Dr. Hennig possesses a unique level of expertise in the specific technology at issue and that the only other individuals with comparable knowledge are the inventor of the patent-in-suit and four people who have significant ties to GE. *Id.* at 6–9; UVAPF Surreply 1–4. Finally, UVAPF argues that GE has publicly disclosed the part of its confidential materials relevant to this lawsuit. UVAPF Br. in Opp. 9–14.

3

Concerning the patent prosecution bar, UVAPF defends its interpretation of the bar's scope and asserts that none of Dr. Hennig's pending patents present the risk of violating the bar because they concern unrelated technology. *Id.* at 16–20.

II. Discussion

Federal Rule of Civil Procedure 26(c)(1) authorizes courts to enter protective orders that restrict the disclosure of information exchanged in discovery for good cause, such as preservation of confidential commercial information and trade secrets. *In re Violation of Rule 28(D)*, 635 F.3d 1352, 1357 (Fed. Cir. 2011); *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1469–70 (9th Cir. 1992). When the parties have entered into a protective order, as they have here, a party seeking to modify or extend that order to address a specific witness bears "the burden of proving good cause, which requires a showing that specific prejudice or harm will result if the protective order is not granted." *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 424 (9th Cir. 2011) (quotations and citations omitted); *see Violation of Rule 28(D)*, 635 F.3d at 1357; *Isis Pharm., Inc. v. Santaris Pharma A/S Corp.*, No. 11cv2214, 2013 WL 3367575, at *3 (S.D. Cal. July 5, 2013). The party seeking to use an expert "bears the burden of showing that there are not other experts available or that those who are available will be less useful than" its chosen expert. *Saso Golf, Inc. v. Nike, Inc.*, No. 08 C 1110, 2009 WL 3242112, at *2 (N.D. Ill. Oct. 5, 2009). The Court must then "balance the [receiving party's] interest in selecting the consultant most beneficial to its case, considering the specific expertise of this consultant and whether other consultants possess similar expertise, against the disclosing party's interest in protecting confidential commercial information from disclosure to competitors." *BASF Corp. v. United States*, 321 F. Supp. 2d 1373, 1378 (Ct. Int'l Trade 2004).

4

*A.    Specific Harm*

To meet its initial burden of demonstrating harm, GE must "show the type of confidential information that will need to be disclosed to [UVAPF's] expert, that this information will be useful to [GE's] competitors, and that [UVAPF's] expert is in a position that could allow the information to be used by competitors." *U.S. Gypsum Co. v. Lafarge N. Am., Inc.*, No. 03 C 6027, 2004 WL 816770, at *1 (N.D. Ill. Mar. 2, 2004).

GE has provided a rough description of the Confidential Materials it has disclosed thus far. The central disclosures in dispute are the source code for GE's MR scanners and the technical documents describing its implementation. GE has produced "over 500 standalone documents consisting of over 17,000 pages and the Pulse Sequence Computer," which contains 114,000 lines of source code and roughly 100 pages of attendant documents. GE Reply Br. 11–12. At oral argument, counsel agreed that the key section of code dealing with flip angle calculation is only 700 lines long, but that those lines reference multiple subroutines described in other parts of the source code.

UVAPF argues that GE could not suffer harm from the disclosure of this information because the formulas its source code uses to calculate flip angles have been publicly disclosed in GE's patents or in published articles by various MR scientists. UVAPF Br. in Opp. 9–14. Although some formulas in the source code may be publicly available, GE contends that the rest of the code and the technical documents describing it contain confidential GE information and trade secrets that would be useful to its competitors. GE Reply Br. 11–13. The Court agrees. The parties' stipulated protective order provides heightened protection for source code, *see* Protective Order ¶ 8, and courts have found that source code presents a "self-evident" risk of harm from disclosure. *Telebuyer, LLC v. Amazon.com, Inc.*, No. 13cv1677, 2014 WL 5804334, at *2 (W.D.

5

Wash. July 7, 2014) (quoting *Rivera v. NIBCO, Inc.*, 384 F.3d 822, 827 (9th Cir. 2004)). Additionally, Dr. Reed Busse, GE's Global MR Research Manager, provided a declaration with a non-exhaustive list of confidential GE technologies described in its source code and other technical documents.[2] Busse Decl. ¶ 8, ECF No. 93-2. GE has made a sufficient showing that the information in its technical documents would be useful to its competitors.

The final consideration is whether providing Confidential Materials to Dr. Hennig may lead to its use by GE's competitors. GE does not argue that Dr. Hennig would intentionally use the information he might view as an expert witness to aid Siemens or any other entity. GE Br. in Supp. 1 ("GE has no reason to doubt [Dr. Hennig's] integrity."). Dr. Hennig has agreed to be bound by the protective order and has signed an acknowledgment form, which was provided to GE as required under paragraph 10 of the protective order. UVAPF Br. in Opp. 4 & n.5. Rather, GE argues that as an active consultant and inventor in the same field as technology disclosed in the Confidential Materials, Dr. Hennig may divulge or use knowledge gained in this litigation through the simple imperfections of human nature. *See* GE Br. in Supp. 10–11 (citing *U.S. Gypsum Co.*, 2004 WL 816770, at *1).

Courts evaluate the risk of inadvertent disclosure by examining any ties or relationships between the proposed expert and the disclosing party's competitors. Generally, an ongoing consulting relationship with a competitor presents a high risk of inadvertent disclosure, while a past or attenuated relationship does not. *See, e.g.*, *Symantec Corp.*, 2012 WL 3582974, at *2–3

---

[2] The source code and other technical documents provided to GE's counsel for production to UVAPF concern numerous other confidential GE technologies including Fast/Turbo Spin Echo data encoding schemes, parallel imaging (which may be utilized with high-density RF coils), phase pre-winding and rewinding pulses, phase correction techniques, non-contrast enhanced MR angiography, T2-prep pulses, multi-species signal nulling, and techniques for acquiring signal in the presence of strong dephasing fields such as near metal implants.
Busse Decl. ¶ 8.

6

(finding the president of a company that offered consulting and analysis in the field at issue presented a substantial risk of inadvertent disclosure); *GPNE Corp. v. Apple Inc.*, No. 5:12cv2885, 2014 WL 1027948, at *2 (N.D. Cal. Mar. 13, 2014) (upholding objection to expert who actively consulted with Apple's competitors, but denying objection to expert who worked at the FCC); *Advanced Semiconductor Materials Am. Inc. v. Applied Materials Inc.*, No. 95-20169, 1996 WL 908654, at *3 (N.D. Cal. Oct. 28, 1996) (finding little risk of disclosure from expert who had not consulted on the technology at issue for four years).

Dr. Hennig has an ongoing indirect relationship with Siemens through his employer and a past direct relationship, having "on occasion worked for Siemens as a consultant in [his] personal capacity." Hennig Decl. ¶¶ 5–7. Dr. Hennig is the head of the University Medical Center Freiburg's MRDAC, which interfaces between the university and industry members and has collaborated with Siemens since 1993. *Id.* ¶ 5; GE's Br. in Supp. Ex. A, at 6. His direct consultation "typically included reports about highlights from scientific meetings, assessment of new technologies and their market perspective as well as strategic advice . . . relating to the market in developing countries." Hennig Decl. ¶ 7. He has also given presentations at meetings organized by Siemens about technology that he helped develop. *Id.* ¶ 8.

Dr. Hennig's direct relationship with Siemens does not appear to relate to the technology at issue in this suit.[3] His consulting projects did not involve developing or implementing pulse sequences and did not lead to him advising Siemens on such technology. Indeed, his direct

---

[3] GE argues that the technology in dispute is "spin-echo sequences for imaging an object and scanners that implement them," and includes in that definition each technological area touched upon by a claim of the patents-in-suit, such as a main magnet system, a gradient magnet system, and radio-frequency transmitters and receivers. GE Reply Br. 5. This scope is too broad, effectively encompassing any expert who consults in MR or in a slew of other fields whose technology MR incorporates. While the Court does not ascribe to the very narrow scope UVAPF advocates, the technology at issue when considering Dr. Hennig's competitive activity cannot include every component of a MR imaging system.

7

consultation did not involve actually developing any technology. His presentations have been summaries of his own or others' research in other areas. To a large degree, Dr. Hennig's direct interactions with Siemens have consisted of him summarizing and explaining various MR technologies. By Dr. Hennig's sworn declaration, none of these have been related to the patents-in-suit.[4]

Dr. Hennig's work through the MRDAC presents a closer question. Those collaborations, at least, involve development of new MR technology, are ongoing, and will continue in the future. GE's apprehension that the knowledge Dr. Hennig gains from consulting in this case could seep, through no fault or intention of his own, into technologies the MRDAC develops with Siemens is the general type of concern that other courts have recognized. *See, e.g., Symantec Corp. v. Acronis Corp.*, No. 11-5310, 2012 WL 3582974, at *1 (N.D. Cal. Aug. 20, 2012) ("[T]here is a tangible risk that [the proposed expert] will not be able to separate the highly confidential information he gleans from reviewing Defendant's source code with his consulting and publication work in that same technical field."); *BASF Corp.*, 321 F. Supp. 2d at 1380 ("It is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so.").

Nevertheless, the Court finds that circumstances in this case temper the threat of inadvertent disclosure. The MRDAC works with Siemens on finite projects, rather than generally attempting to improve Siemens's MR technology. As such, there would have to be an overlap between the specific project undertaken and some confidential knowledge gained by Dr. Hennig before even the possibility of inadvertent disclosure arises. Dr. Hennig has sworn, and the Court is satisfied with its own in-camera review, that no MRDAC project has related to the technology

---

[4] Of course, should Dr. Hennig renew a personal consulting relationship with Siemens or another of GE's competitors, the Court's assessment of the risk of disclosure may change.

in the patents-in-suit. Dr. Hennig is the head of the MRDAC and presumably has extensive control over his own involvement in research collaborations. Going forward, the nature of the MRDAC and Siemens's finite projects provides an easy and obvious method for Dr. Hennig to spot the potential for inadvertent disclosure and take precautions against it. Furthermore, the MRDAC already has experience maintaining confidentiality between competitors. Besides Siemens, the MRDAC has active collaborations with Bruker and Esaote, which GE identifies as competitors with itself and Siemens in the market for MR technology. *See* Hennig Decl. ¶ 6; GE Br. in Supp. 3.

Beyond his consulting activities, Dr. Hennig presents an additional risk of inadvertent disclosure as an independent inventor. When examining patent prosecution bars, courts approach the inadvertent disclosure analysis by asking whether the person who will view confidential information engages in "competitive decision-making." *See, e.g.*, *In re Deutsche Bank Trust Co. Ams.*, 605 F.3d 1373, 1378 (Fed. Cir. 2010); *Brown Bag Software*, 960 F.2d at 1470. As someone "'substantially engaged' in patent prosecution who ha[s] 'the opportunity to control the content of patent applications,'" an "expert witness who prepares or applies for patents [himself] is undoubtedly a competitive decision-maker." *Applied Signal Tech., Inc. v. Emerging Mkts. Commc'ns, Inc.*, No. C-09-02180, 2011 WL 197811, at *5 (N.D. Cal. Jan. 20, 2011) (quoting *Deutsche Bank*, 605 F.3d at 1380). Rather than finite and externally defined projects like those undertaken by the MRDAC, an inventor's endeavors are naturally driven by his own creativity and ingenuity, presenting a greater opportunity for subconscious use of material gleaned from other sources. Litigants and courts acknowledge this risk by applying safeguards: in this case, a prosecution bar and Dr. Hennig's signed acknowledgement to abide by the protective order.

9

B.     *Dr. Hennig's Uniqueness*

UVAPF contends that there is not another individual with comparable expertise to Dr. Hennig available to testify. UVAPF Br. in Supp. 6–9. In his declaration, Dr. Hennig states that there are "only a handful of researchers" with significant expertise in the subfield of the claimed invention, "a pulse sequence for a magnetic resonance scanner that uses variable-flip-angle refocusing pulses to extend the spin echo train for the sequence." Hennig Decl. ¶ 2. He names himself, Dr. Reed Busse, and John Mugler, a named inventor on the '644 patent, as the top three in the field, followed by "R. Scott Hinks (Chief Scientist at GE), Patrick Le Roux (retired GE physicist), and David Aslop (a longtime GE collaborator currently at Beth Israel Deaconess Medical Center)." *Id.* at ¶ 3. Dr. Hennig is "not aware of any other scientists who have published significantly or otherwise have substantial expertise in this particular area." *Id.* Plaintiff's counsel contacted Dr. Aslop, who indicated he was not interested in being a witness and did not respond to further inquiries. Joseph DePumpo Decl., August 13, 2015, ¶¶ 2–5, ECF No. 90. UVAPF thus concluded that Dr. Hennig is the only expert with substantial expertise who is not a current or former GE employee or an inventor of the patents-in-suit.

As a counter-argument, GE asserts that the field of experts is much broader than the subfield identified by UVAPF.[5] A party's unnecessarily narrow definition of an expert's field may provide a false impression that the expert is unique. On the other hand, the technology at issue may concern a highly specialized field from which the pool of experts is limited. UVAPF insists that it needs Dr. Hennig precisely because the subfield of MR imaging technology concerning "the use of variable flip-angle pulses to extend the spin-echo train" is highly specialized. UVAPF Br. in Opp. 6-7; Hennig Decl. ¶ 2.

---

[5] GE notes that the International Society for Magnetic Resonance in Medicine has over 8,000 members. GE Br. in Supp. 13.

In his declaration, Dr. Busse disagrees with Dr. Hennig's conclusion that only six scientists have substantial expertise in variable-flip-angle refocusing pulses. Busse Decl. ¶ 12. Dr. Busse cites ten scholarly articles on the subject dating back to 1994 to demonstrate that the technique has been widely known for 20 years. *Id.* ¶¶ 13–19. He highlights the many authors and co-authors of these articles and concludes that the techniques at issue "have become well-known to, and well-understood by, the MR community," such that he estimates "hundreds are familiar with these techniques." *Id.* ¶ 20.

The support Dr. Busse provides for GE's argument partly undermines its position. Of the ten articles cited by Dr. Busse, the lead author for eight of them is one of the six individuals identified by Dr. Hennig. *See* Hennig Decl. ¶ 3; Busse Decl. ¶¶ 13–19; UVAPF Surreply 3. UVAPF has also put forward evidence that Dr. Hennig has been the primary author for eight landmark research papers on spin-echo train pulse sequences, six of which also dealt with variable flip angles. UVAPF Surreply 3 & n.6. While UVAPF has not proven that Dr. Hennig is the only individual with knowledge of the relevant technological niche, it has demonstrated that his expertise outstrips that of other potential candidates. Furthermore, Dr. Hennig stands out because he is not affiliated with GE or the patents-in-issue and is willing to testify against GE. *See RR Donnelley & Sons Co. v. Xerox Corp.*, No. 12 C 6198, 2013 WL 6696652, at *2 (N.D. Ill. Dec. 19, 2013) (denying Xerox's motion to exclude the plaintiff's expert when few experts existed in the relevant field and the majority of those experts worked for Xerox); *Saso Golf*, 2009 WL 3242112, at *4 (granting an expert access to some confidential materials even though he actively consulted with Nike's competitors because he was one of the few willing to testify against Nike). UVAPF has made a sufficient showing "that there are not other experts available

11

or that those who are available will be less useful than [Dr. Hennig]." *U.S. Gypsum Co.*, 2004 WL 816770, at *1.

C.   *Balance of Interests*

When a party does not present evidence that its desired expert is unique, Courts reject the expert on its opponent's showing of potential harm. *See, e.g.*, *Symantec Corp.*, 2012 WL 3582974, at *3 (denying an expert who "actively consults with Defendant's competitors" access to its confidential materials because the defendant did not make "a showing that he possesses unique knowledge which no other experts possess"); *GPNE Corp.*, 2014 WL 1027948, at *2 ("GPNE has not identified any unique qualifications or knowledge that make Heidari better suited than any other expert to serve."). Conversely, courts are willing to accept greater risks of inadvertent disclosure when the proposed expert possesses unique expertise. *See, e.g.*, *Isis Pharm.*, 2013 WL 3367575, at *6–7 (granting expert access to confidential information "[b]ased on the small size and highly specialized nature of the [relevant] industry" despite finding the expert's ongoing consulting posed "some potential risk of inadvertent disclosure of defendants' confidential information"). This willingness stems largely from courts' recognition that prohibiting disclosure of information to such an expert may unreasonably impair a party's ability to prosecute its case. *Id.* at *7.

The Court finds that Dr. Hennig's value to UVAPF as a uniquely qualified witness outweighs the potential harm from his review of GE's Confidential Materials. Dr. Hennig presents some risk of inadvertent disclosure, especially as an independent inventor. Nevertheless, the evidence provided by both parties shows that there are few individuals with significant publications and expertise in the niche field at issue and that Dr. Hennig is the only expert with such high qualifications who is willing and able to testify in this case. The danger of inadvertent

misuse is eased by the indirect nature of Dr. Hennig's consulting work through the MRDAC and his agreement to abide by the protective order and the patent prosecution bar. *See Promega Corp. v. Applera Corp.*, No. 01-C-244-C, 2002 WL 32359938, at *8 (W.D. Wis. June 7, 2002) ("I conclude that defendants' interest in selecting Dr. Gibbs as their expert, in conjunction with the safeguards defendants have proposed, outweighs plaintiff's speculative fear that it will suffer competitive injury as a result of disclosing to Dr. Gibbs.").

The Court's finding is particularly influenced by the presence of the prosecution bar, which is analyzed and defined in the following section. *See Applied Signal*, 2011 WL 197811 at *1 ("[C]ourts authorize the inclusion of patent prosecution bars in protective orders as a less drastic alternative to the disqualification of counsel or experts."). In short, if Dr. Hennig receives or reviews Confidential Materials of a proprietary and technical nature concerning technologies within GE's accused products, he may not develop patents in those technologies until a year after the completion of this litigation. The bar would also be violated if he receives or reviews Confidential Materials related to any of his active patent applications, providing a substantive limitation on Dr. Hennig's review.[6] Considering the steps required to take this case through trial and the possibility of an Inter Partes Review and appeal of the district court's judgment to higher courts, Dr. Hennig will be bound by the prosecution bar for years after his service as an expert. The Court finds that this bar provides appropriate additional protection against inadvertent disclosure in the area where it is needed most—Dr. Hennig's activity as an independent inventor.

---

[6] GE provides evidence that there is overlap between some of the technology disclosed in its Confidential Materials and Dr. Hennig's patent applications. *Compare* Busse Decl. ¶ 8 ("phase pre-winding and rewinding pulses"), *with* Hennig Decl. ¶ 9 ("prewinding pulses in MR sequences"). UVAPF denies this issue by reading the prosecution bar very narrowly. UVAPF Br. in Opp. 16–20. With the bar clearly defined by this opinion, UVAPF and Dr. Hennig can reevaluate the risk of violating the bar and restrict his access to portions of the Confidential Materials if necessary.

13

In granting Dr. Hennig access to GE's Confidential Materials, the Court imposes one additional safeguard: UVAPF may disclose only technical documents to Dr. Hennig. In its reply brief, GE argues that Dr. Hennig has worked as a business as well as a technical consultant to GE, citing to Dr. Hennig's statements that he provided "strategic advice to Siemens . . . relating to the market in developing countries," and presented his research at conferences organized by Siemens as "part of [its] marketing strategy." GE Reply Br. 6 & nn.7–8; *see* Hennig Decl. ¶¶ 7–8. GE thus identifies a further risk of harm from Dr. Hennig's review of sales, marketing, and strategic planning materials that are included in GE's Confidential Materials. While the Court is not convinced that Dr. Hennig acted, or will act, as a business consultant, Dr. Hennig's unique worth as an expert is tied to his extensive experience with variable-flip-angle refocusing pulses. Outside that area of expertise, Dr. Hennig is not distinctive. UVAPF may want an expert to review GE's sales, marketing, and strategic planning materials at some point in this litigation. In balancing the parties' competing interests, the Court finds it appropriate to limit the disclosure of non-technical information to Dr. Hennig, who after all was chosen for his niche technical knowledge. *See U.S. Gypsum Co.*, 2004 WL 816770, at *3 ("It would also seem that financial and customer information that may be disclosed because [it is] possibly relevant to the issue of damages is not the type of information that need be provided to a technical expert.").

D.    *Prosecution Bar*

The parties disagree on the scope of the prosecution bar. Protective Order ¶ 7(iv). GE argues that the plain language of the bar prohibits persons from working on patents related to any Confidential Material they receive. GE Br. in Supp. 6–8, 11–12; GE Reply Br. 13–15. GE identifies two of Dr. Hennig's pending patent applications that it believes fall under the bar and expresses concern that there are more. *Id.*

14

When the Court reviewed the parties' proposed protective orders in June, it addressed various aspects of the prosecution and acquisition bars, *see* Memorandum & Order, June 11, 2015, at 10, ECF No. 61, but did not analyze the subject matter covered by the prosecution bar, which reads:

> Persons entitled to access "CONFIDENTIAL OUTSIDE COUNSEL EYES ONLY" materials shall not provide input to, or participate in the drafting, amending, or prosecution of patent applications, including reissue patent applications, related to the "CONFIDENTIAL OUTSIDE COUNSEL EYES ONLY" material actually received or reviewed by the person for the duration of one year following completion of this case.

Protective Order ¶ 7(iv). GE's interpretation is an accurate reading of the prosecution bar. Upon direct review, however, the Court finds that the bar's language is vague.

Courts evaluating prosecution bars "must be satisfied that the kind of information that will trigger the bar is relevant to the preparation and prosecution of patent applications before the PTO." *Deutsche Bank*, 605 F.3d at 1381. A bar whose subject matter depends only upon a party's classification of what information it considers confidential lacks the requisite specificity to comply with this directive. *See Opperman v. Path, Inc.*, No. 13cv453, 2013 WL 5643334, at *2 (N.D. Cal. Oct. 15, 2013) (rejecting a proposed bar to prosecution of patents related to confidential materials received and requiring a new version "that identifies with sufficient specificity the information that would trigger it and that is tailored to apply only to information that is relevant to the preparation or prosecution of patent applications."). Because prosecution bars are justified by the potential for inadvertent disclosure, they must be tailored to "reflect the risk presented by the disclosure of proprietary competitive information." *Deutsche Bank*, 605 F.3d at 1381; *see also Eon Corp. IP Holdings, LLC v. AT & T Mobility LLC*, 881 F. Supp. 2d 254, 258 (D.P.R. 2012) (finding a bar on prosecuting patents relating to the subject matter of the confidential information to be "circular and vague").

15

The subject matter of the prosecution bar should start with the patents-in-suit. *Applied Signal Tech*, 2011 WL 197811, at *3 ("[T]he proper subject matter of the proposed prosecution bar in this case should be coextensive with the subject matter of the patents-in-suit."); *Telebuyer*, 2014 WL 5804334, at *4 (same); *EPL Holdings, LLC v. Apple, Inc.*, No. 12cv4306, 2013 WL 2181584, at *5 (N.D. Cal. May 20, 2013) (same); *Eon Corp.*, 881 F. Supp. 2d at 258 (same). In cases where the dispute—and therefore the discovery—is narrowed to the technology described in the patents-in-suit, that scope alone may be a sufficient definition for a prosecution bar. In this case, however, UVAPF alleges that its patent has been violated by many complex GE products, which contain more technologies than just those claimed in the patents-in-suit. UVAPF requested discovery related to all of these products, including "at least six different pulse sequences [and] 32 different MR scanners." GE Reply Br. 13 n.10. GE has shown that their responsive discovery for the sequences and scanners includes descriptions of other confidential GE technologies outside the scope of the patents-in-suit. *See* Busse Decl. ¶ 8. Anyone who reviews these materials becomes at risk of inadvertently disclosing confidential information when they act in those respective technological areas.

In order to reflect the risk of inadvertent disclosure, the prosecution bar's subject matter must extend beyond that of the patents-in-suit in the same manner as the proprietary competitive information at issue has been extended by the breadth of UVAPF's allegations. *See Deutsche Bank*, 605 F.3d at 1381. The bar should not, however, extend to material that is not relevant to "the preparation and prosecution of patent applications." *Id.* The prosecution bar should thus encompass the subject matter of the patents-in-suit and the proprietary[7] technical aspects of GE's

---

[7] The Court includes "proprietary" in recognition of the reality that litigants can be over-inclusive in their designation of confidential information. *See* James Juo & David J. Pitman, *A Prosecution Bar in Patent Litigation Should Be the Exception Rather Than the Rule*, 15 Va. J.L.

16

products that allegedly infringe these patents. *See, e.g.*, *PPC Broadband, Inc. v. Times Fiber Commc'ns, Inc.*, No. 5:13cv460, 2014 WL 859111, at *2 (N.D.N.Y. Mar. 5, 2014) (analyzing a prosecution bar that covered materials "concerning the non-public, technical product features disclosed" in discovery identified as highly confidential).

"Courts have the inherent power to modify protective orders, including protective orders arising from a stipulation by the parties." *SmithKline Beecham Corp. v. Synthon Pharm., Ltd.*, 210 F.R.D. 163, 166 (M.D.N.C. 2002); *see also In re Kolon Indus. Inc.*, 479 F. App'x 483, 486 (4th Cir. 2012). In light of issues related above, and the parties' disagreement about the scope of the prosecution bar, the Court finds good cause to modify the prosecution bar as follows:

> Persons entitled to access "CONFIDENTIAL OUTSIDE COUNSEL EYES ONLY" materials shall not provide input to, or participate in the drafting, amending, or prosecution of patent applications, including reissue patent applications, related to *"CONFIDENTIAL OUTSIDE COUNSEL EYES ONLY" material that concerns the subject matter of the patents-in-suit or the proprietary technical aspects of GE's products that allegedly infringe those patents and is* ~~the "CONFIDENTIAL OUTSIDE COUNSEL EYES ONLY" material~~ actually received or reviewed by the person for the duration of one year following completion of this case.

Through Dr. Busse, GE has offered evidence that two of Dr. Hennig's current patent applications concern technology in GE's accused products.[8] Prosecution of these patents could violate the prosecution bar as defined above. Whether the prosecution bar attaches to these technologies for Dr. Hennig, however, depends on whether he actually receives or reviews

---

& Tech. 43, 68 & n.171 (2010) ("Unfortunately, the highest level of confidentiality provided for in a protective order often becomes the default designation in practice."). The patent bar only applies to materials that meet the protective order's definition of "CONFIDENTIAL OUTSIDE COUNSEL EYES ONLY" as "commercially sensitive information . . . likely to cause significant competitive harm" by its disclosure. Protective Order ¶ 1.b. If alongside GE's confidential technologies a document describes a commonplace and widely-known aspect of MRI technology, the bar would only attach to the confidential material.

[8] Although Dr. Hennig has agreed to be bound by the patent prosecution bar, he has not sworn off further prosecution activities. Such a concession would obviate GE's cause for concern. *See GPNE*, 2014 WL 1027948, at *2.

17

Confidential Materials describing them. The Court declines to deny Dr. Hennig access to GE's Confidential Materials based upon a speculative and avoidable violation of the prosecution bar.

Dr. Hennig's uniqueness as an expert is tied to his self-described specialized knowledge in using "variable-flip-angle refocusing pulses to extend the spin echo train for [a pulse] sequence." Hennig Decl. ¶ 2; *see generally id.* ¶¶ 2–4. Dr. Hennig is confident that none of his current patent applications relate to that technology. *Id.* ¶ 9. The Court sees no imminent violation of the prosecution bar from Dr. Hennig reviewing the Confidential Materials directly related to flip-angle refocusing pulse sequence formulas. Beyond that, the Court lacks the information necessary to adjudicate Dr. Hennig's potential violation of the prosecution bar. This analysis is best performed through communication between UVAPF, who possess GE's Confidential Materials, and Dr. Hennig, who knows the contents of his patent applications. With careful disclosure, UVAPF should be able to have its preferred expert review the Confidential Materials related to his expertise, while avoiding any conflicts presented by the prosecution bar. Dr. Hennig, like any other expert in this case, must agree to be bound by the protective order, which subjects violators to contempt proceedings and is "generally accepted as an effective way of protecting sensitive information while granting trial counsel limited access to it for purposes of the litigation." *Deutsche Bank*, 605 F.3d at 1378. If UVAPF requires analysis of Confidential Materials that relate to one of Dr. Hennig's applications, UVAPF may employ another expert who does not have active patent applications in that technology.

The Court recognizes that Dr. Hennig possesses unique expertise in the particular technology raised by the patents-in-suit. The Court also recognizes that Dr. Hennig presents a heightened risk of inadvertent misuse as an active inventor and the breadth of accused instrumentalities in this case has led GE to disclose confidential technologies beyond those

directly claimed by the patents-in-suit. In this situation, the Court finds that a clear record of what Confidential Materials Dr. Hennig reviews will benefit GE, UVAPF, and Dr. Hennig. Therefore, UVAPF will maintain a record of which Confidential Materials Dr. Hennig receives or reviews and provide a copy of this record to Dr. Hennig and GE as it is updated. This record should be created and disclosed in the same manner as the Pulse Sequence Print Log in the protective order. *See* Protective Order ¶ 8(v).

### III. Conclusion

For the reasons stated above, the Court grants GE's motion as to non-technical materials such as sales, marketing, and strategic planning materials, and denies it as to technical materials. UVAPF must keep a record of the Confidential Materials Dr. Hennig receives or reviews and provide a copy of it to Dr. Hennig and GE as it is updated.

Furthermore, the prosecution bar in paragraph seven of the Stipulated Protective Order will be amended to state the following:

> Persons entitled to access "CONFIDENTIAL OUTSIDE COUNSEL EYES ONLY" materials shall not provide input to, or participate in the drafting, amending, or prosecution of patent applications, including reissue patent applications, related to "CONFIDENTIAL OUTSIDE COUNSEL EYES ONLY" material that concerns the subject matter of the patents-in-suit or the proprietary technical aspects of GE's products that allegedly infringe those patents and is actually received or reviewed by the person for the duration of one year following completion of this case.

A separate order will enter.

ENTER: November 20, 2015

Joel C. Hoppe
United States Magistrate Judge